Gary Gotto, No. 007401
KELLER ROHRBACK, P.L.C.
3101 North Central Avenue
Suite 1400
Phoenix, Arizona 85012
ggotto@kellerrohrback.com
Tel:  602-248-0088
Fax: 602-248-2822

*Counsel for Plaintiffs*

[Additional counsel for Plaintiffs listed on signature page]

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| AMR M. AMR, MURRAY AVENT, TOM AVENT, PETER AYREY, JOHN BARATTA, JOHN BARATTA, IRA, DONNA BARATTA, IRA, JOHN BARATTA, CUSTODIAN FOR ALEXANDRA BARATTA, DONALD BARNETT, PATRICK BIGG, GEORGE BOCK, PAUL BOTTA, BARRY CARDINER, ROD COMER, GRAHAM DEFRIES, JAMES DONOHUE, DINA M. DROVETTO, MARTIN FINDLAY, PATRICK FITZGERALD, COLIN GARDNER, ROB GRATON, JOHN HALLE, SLOE HARDIN, JEFF HOOVER, JON ISAKSSON, DANIEL KRUEGER, MICHAEL KUSHNER, CAROLINE KUSHNER, ALAN LEVINE, QUINFANG LI, FRANK W. LIN, KANG LIU, MICHAEL MAYER, BARBARA MAYER, CHARLES McGOWAN, GENE MONACO, GEORGE F. MORGANTHALER, CHRIS MULROONEY, JONATHAN NELSON, KEITH NICHOLSON, UDO NIEHAGE, AZAD OOTAM, MICHAEL PIATT, JAMES PRICE, FRANK PRIETO, INGO RAFF, STEVEN RATHJEN, TROY REISNER, DONALD RICHARDS, TORSTEIN ROBSTAD, DEBRA ROSS, RAYMOND SHARP, ALAN SHELDON, MARC SKALETSKY, KATHLEEN W. SMITH, DOMINICK STALLONE, DAVID THOMPSON, JOSEPH | CIV No.: <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND COMMON LAW** <br> **JURY TRIAL DEMANDED** |

1

VIRZI, STEVEN WAITEKAITIS, JOHN WEISEL, KEVIN WILSON, GERD WITTKEMPER and RENJIE YUAN,

Plaintiffs,

v.

VINCENT F. SOLLITTO, JR., JAMES CHING HUA LI, MAN KIT (THOMAS) CHOW, JOHN S. HODGSON, CHRISTOPHER C.L. LIU, WAYNE PRATT and ROGER KO,

Defendants.

Plaintiffs Amr M. Amr, Murray Avent, Tom Avent, Peter Ayrey, John Baratta, John Baratta, Ira, Donna Baratta, Ira, John Baratta, Custodian For Alexandra Baratta, Donald Barnett, Patrick Bigg, George Bock, Paul Botta, Barry Cardiner, Rod Comer, Graham Defries, James Donohue, Dina M. Drovetto, Martin Findlay, Patrick Fitzgerald, Colin Gardner, Rob Graton, John Halle, Sloe Hardin, Jeff Hoover, Jon Isaksson, Daniel Krueger, Michael Kushner, Caroline Kushner, Alan Levine, Quinfang Li, Frank W. Lin, Kang Liu, Michael Mayer, Barbara Mayer, Charles McGowan, Gene Monaco, George F. Morganthaler, Chris Mulrooney, Jonathan Nelson, Keith Nicholson, Udo Niehage, Azad Ootam, Michael Piatt, James Price, Frank Prieto, Ingo Raff, Steven Rathjen, Troy Reisner, Donald Richards, Torstein Robstad, Debra Ross, Raymond Sharp, Alan Sheldon, Marc Skaletsky, Kathleen W. Smith, Dominick Stallone, David Thompson, Joseph Virzi, Steven Waitekaitis, John Weisel, Kevin Wilson, Gerd Wittkemper and Renjie Yuan, (collectively, "Plaintiffs"), by and through their counsel, hereby file this complaint, against the defendants named herein former officers and directors of Syntax-Brillian Corp. ("S-B" or the "Company") and, in support thereof, allege upon personal knowledge as to plaintiffs and plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through plaintiffs' attorneys, which included, among other things, a review of the public documents and announcements made by defendants, Securities and Exchange Commission ("SEC") filings, and press releases regarding S-B as follows:

2

## NATURE OF THE ACTION

1.    Plaintiffs purchased the common stock of Syntax Brillian on various dates from July 12, 2006 through November 15, 2007 (the "Relevant Purchase Period") in reliance on public statements made by or on behalf of S-B and defendants, including press releases and periodic reports filed by S-B with the SEC.

2.    From mid 2006 through late 2007, defendants misrepresented the growth of S-B's business and S-B's financial condition and encouraged investors to believe that S-B was a growing and potentially very profitable and valuable company.

3.    Contrary to all prior statements, on September 12, 2007, S-B announced: (1) dismal 2007 fiscal year-end results; (2) first quarter fiscal 2008 fiscal year projections that were significantly below expectations due to anticipated weak sales in China; and (3) the resignation of its then Chief Financial Officer, defendant Wayne Pratt.  S-B also disclosed that its auditors Ernst & Young had identified material weaknesses in controls related to its inventory and revenue process, reserves and allowances process, income tax provision process and financial statement closing procedures.

4.    The Company further disclosed that it was experiencing trouble securing sufficient supplies of panels, that it did not have adequate financing to meet demand, and that it was experiencing difficulty in collecting its receivables in a timely manner.

5.    All of these facts were known to S-B and its directors and officers as they occurred, but nonetheless, S-B did not disclose such facts, but rather, intentionally and fraudulently led plaintiffs to believe otherwise.

6.    The September 12, 2007 disclosures, which contradicted much of the information S-B issued to the market during the period in question concerning S-B's reported revenues and results, only partially disclosed the true adverse financial and operational condition of S-B but nonetheless caused S-B's stock price to drop the next day from $6.13 to $4.01, or 35% on trading volume of 36 million shares (nearly 14 times the average daily volume) eventually by November 15, 2007, the price of S-B declined to $2.89 as additional disclosures of previously concealed information occurred.  S-B is now in Chapter 11 Bankruptcy.

3

## JURISDICTION AND VENUE

7.    The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j (b) and 78t (a) and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5 and the common law.

8.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act as the Company maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

10.    In connection with the acts, transactions and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

11.    Plaintiff Amr M. Amr, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

12.    Plaintiff Murray Avent, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

13.    Plaintiff Tom Avent, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

14.    Plaintiff Peter Ayrey, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

15.    Plaintiff John Baratta, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

16.    Plaintiff John Baratta, IRA, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

4

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

17.     Plaintiff Donna Baratta, IRA, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

18.     Plaintiff John Baratta, Custodian for Alexandra Baratta, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

19.     Plaintiff Donald Barnett, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

20.     Plaintiff Patrick Bigg, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

21.     Plaintiff Georges Bock, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

22.     Plaintiff Paul Botta, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants

23.     Plaintiff Barry Cardiner, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

24.     Plaintiff Rod Comer, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

25.     Plaintiff Graham Defries, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

26.     Plaintiff James Donohue, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

27.     Plaintiff Dina M. Drovetto, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

28.     Plaintiff Martin Findlay, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

29.     Plaintiff Patrick Fitzgerald, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

1        30.    Plaintiff Colin Gardner, bought shares of S-B during the Relevant Purchase

2  Period and suffered loss and damage as more fully set forth herein caused by defendants.

3        31.    Plaintiff Rob Graton, bought shares of S-B during the Relevant Purchase Period

4  and suffered loss and damage as more fully set forth herein caused by defendants

5        32.    Plaintiff John Halle, bought shares of S-B during the Relevant Purchase Period

6  and suffered loss and damage as more fully set forth herein caused by defendants.

7        33.    Plaintiff Sloe Hardin, bought shares of S-B during the Relevant Purchase Period

8  and suffered loss and damage as more fully set forth herein caused by defendants.

9        34.    Plaintiff Jeff Hoover, bought shares of S-B during the Relevant Purchase Period

10  and suffered loss and damage as more fully set forth herein caused by defendants.

11        35.    Plaintiff Jon Isaksson, bought shares of S-B during the Relevant Purchase Period

12  and suffered loss and damage as more fully set forth herein caused by defendants.

13        36.    Plaintiff Daniel Krueger, bought shares of S-B during the Relevant Purchase

14  Period and suffered loss and damage as more fully set forth herein caused by defendants.

15        37.    Plaintiff Michael Kushner, bought shares of S-B during the Relevant Purchase

16  Period and suffered loss and damage as more fully set forth herein caused by defendants.

17        38.    Plaintiff Caroline Kushner, bought shares of S-B during the Relevant Purchase

18  Period and suffered loss and damage as more fully set forth herein caused by defendants.

19        39.    Plaintiff Alan Levine, bought shares of S-B during the Relevant Purchase Period

20  and suffered loss and damage as more fully set forth herein caused by defendants.

21        40.    Plaintiff Quinfang Li, bought shares of S-B during the Relevant Purchase Period

22  and suffered loss and damage as more fully set forth herein caused by defendants.

23        41.    Plaintiff Frank W. Lin, bought shares of S-B during the Relevant Purchase Period

24  and suffered loss and damage as more fully set forth herein caused by defendants.

25        42.    Plaintiff Kang Liu, bought shares of S-B during the Relevant Purchase Period and

26  suffered loss and damage as more fully set forth herein caused by defendants.

27        43.    Plaintiff Michael Mayer, bought shares of S-B during the Relevant Purchase

28  Period and suffered loss and damage as more fully set forth herein caused by defendants.

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

44.     Plaintiff Barbara Mayer, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

45.     Plaintiff Charles McGowan, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

46.     Plaintiff Gene Monaco, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

47.     Plaintiff George F. Morganthaler, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

48.     Plaintiff Chris Mulrooney, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

49.     Plaintiff Keith Nicholson, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

50.     Plaintiff Jonathan Nelson, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

51.     Plaintiff Udo Niehage bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

52.     Plaintiff Azad Ootam, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

53.     Plaintiff Michael Piatt, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

54.     Plaintiff James Price, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

55.     Plaintiff Frank Prieto, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

56.     Plaintiff Ingo Raff, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

7

57.     Plaintiff Steven Rathjen, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

58.     Plaintiff Troy Reisner, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

59.     Plaintiff Donald Richards, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

60.     Plaintiff Torstein Robstad, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

61.     Plaintiff Debra Lynn Ross, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

62.     Plaintiff Raymond Sharp, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

63.     Plaintiff Alan Sheldon, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

64.     Plaintiff Marc Skaletsky, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

65.     Plaintiff Kathleen W. Smith, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

66.     Plaintiff Dominick Stallone, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

67.     Plaintiff David Thompson, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

68.     Plaintiff Joseph Virzi, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

69.     Plaintiff Steven Waitekaitis, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

70.     Plaintiff John Weisel, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

8

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

71.     Plaintiff Kevin Wilson, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

72.     Plaintiff Gerd Wittkemper, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

73.     Plaintiff Renjie Yuan, bought shares of S-B during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

**DEFENDANTS**

74.     S-B has filed a voluntary Chapter 11 petition for bankruptcy.  Accordingly, Section 362(a) of the Bankruptcy Code mandates that an automatic stay take effect.  But for Section 362(a) of the Bankruptcy Code, S-B would be named as a defendant in this action.

75.     Defendant Vincent Sollitto, Jr. ("Sollitto") was Chief Executive Officer from June 2003 through September 2007. In October 2007, he was appointed Executive Chairman of the Board of Directors.  He was named Chairman of the Board in December 2005. During the Relevant Purchase Period, Sollitto caused S-B to issue over a dozen bullish, but materially false and misleading, press releases and was quoted in many of them. Sollitto signed the Company's periodic financial reports on Forms 10Q and 10K issued during the Relevant Purchase Period which were filed with the Securities and Exchange Commission. In connection therewith, Sollitto signed materially false and misleading certifications. Sollitto was privy to true information concerning the phony transactions between S-B and , among others, South China House of Technology and Taiwan Kolin Co. Ltd. Notwithstanding that knowledge, Sollitto allowed S-B's financial statements to falsely reflect those transactions  which rendered the financial statements issued by  SB during the Relevant Purchase Period materially false and misleading

76.     Defendant James Ching Hua Li ("Li") was appointed Chief Executive Officer effective October 2007 and has been a director of S-B since December 2005 when he assumed the positions of President and Chief Operating Officer of S-B. During the Relevant Purchase Period, Li caused S-B to issue over a dozen bullish, but materially false and misleading, press releases and Form 10 Qs and prospectuses.  Li signed the Company's periodic financial reports on Form

9

1    10K and Registration Statements issued during the Relevant Purchase Period which were filed
2    with the Securities and Exchange Commission. Li was privy to true information concerning the
3    phony transactions between S-B and , among others, South China House of Technology and
4    Taiwan Kolin Co. Ltd. Notwithstanding that knowledge, Li  allowed S-B's financial statements
5    to falsely reflect those transactions  which rendered the financial statements issued by SB during
6    the Relevant Purchase Period materially false and misleading.

7        77.    Defendant Man Kit (Thomas) Chow ("Chow") was the Company's Executive Vice-
8    President and Chief Procurement Officer.  He served as Chief Procurement Officer and a director
9    of the Company since November 2005.  Chow served as Syntax Groups Company's s Chief
10   Financial Officer from May 1, 2004 until the merger with Brillian in November 2005 (the
11   "Merger").  On May 24, 2007, he sold 1,399,999 shares of S-B stock at $5.75 per share for a
12   total of $ 8,049,994.25 in cash. During the Relevant Purchase Period, Chow caused S-B to issue
13   over a dozen bullish, but materially false and misleading, press releases and Form 10 Qs and
14   prospectuses.  Chow signed the Company's periodic financial reports on Form 10K and
15   Registration Statements issued during the Relevant Purchase Period which were filed with the
16   Securities and Exchange Commission. Chow was privy to true information concerning the phony
17   transactions between S-B and, among others, South China House of Technology and Taiwan
18   Kolin Co. Ltd. Notwithstanding that knowledge, Chow allowed S-B's financial statements to
19   falsely reflect those transactions  which rendered the financial statements issued by S-B during
20   the Relevant Purchase Period materially false and misleading.

21       78.    Defendant Wayne Pratt ("Pratt") was the Company's Vice President, Chief
22   Financial Officer, Secretary and Treasurer at all relevant times.  He resigned his positions
23   with the Company effective on September 30, 2007. During the Relevant Purchase Period, Pratt
24   caused S-B to issue over a dozen bullish, but materially false and misleading, press releases and
25   was quoted in many of them. Pratt signed the Company's periodic financial reports on Forms
26   10Q and 10K and Registration Statements issued during the Relevant Purchase Period which
27   were filed with the Securities and Exchange Commission. In connection therewith, Pratt signed
28   materially false and misleading certifications. Pratt was privy to true information concerning the

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

1   phony transactions between S-B and , among others, South China House of Technology and

2   Taiwan Kolin Co. Ltd. Notwithstanding that knowledge, Pratt allowed S-B's financial statements

3   to falsely reflect those transactions  which rendered the financial statements issued by  SB during

4   the Relevant Purchase Period materially false and misleading.

5          79.     Defendant John S. Hodgson ("Hodgson") served as the Chairman of the Audit

6   Committee of S-B's Board of Directors from 2005 until September 2007 and as a director of S-B

7   from November 2005 until his resignation on March 27, 2008.  Hodgson additionally served as

8   the Company's CFO, Executive Vice President and Treasurer from October 2007 until his

9   resignation on March 24, 2008. During the Relevant Purchase Period, Hodgson caused S-B to

10  issue over a dozen bullish, but materially false and misleading, press releases. Hodgson signed

11  the Company's periodic financial reports on Form 10Q and Registration Statements issued

12  during the Relevant Purchase Period which were filed with the Securities and Exchange

13  Commission. In connection therewith, Hodgson signed a materially false and misleading

14  certification. Hodgson, as head of S-B's Audit Committee was privy to true information

15  concerning the phony transactions between S-B and, among others, South China House of

16  Technology and Taiwan Kolin Co. Ltd. Notwithstanding that knowledge, Hodgson allowed S-

17  B's financial statements to falsely reflect those transactions which rendered the financial

18  statements issued by SB during the Relevant Purchase Period materially false and misleading.

19         80.     Defendant Christopher C.L. Liu was a director of S-B at all relevant times. In

20  May 29, 2007, while in possession of material adverse non-public information about S-B, Liu

21  sold 869,565 shares of S-B at $5.75 per share realizing approximately $5 million.  At all times

22  relevant to this action Liu was a director of S-B, the President and a director of Kolin and a

23  director of Digi Media Technology Co., Ltd. During the Relevant Purchase Period, Liu caused S-

24  B to issue over a dozen bullish, but materially false and misleading, press releases and Form 10

25  Qs and prospectuses.  Liu signed the Company's periodic financial reports on Form 10K and

26  Registration Statements issued during the Relevant Purchase Period which were filed with the

27  Securities and Exchange Commission. Liu was privy to true information concerning the phony

28  transactions between S-B and, among others, South China House of Technology and Taiwan

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

1   Kolin Co. Ltd. Notwithstanding that knowledge, Liu allowed S-B's financial statements to

2   falsely reflect those transactions which rendered the financial statements issued by SB during

3   the Relevant Purchase Period materially false and misleading.

4        81.    Defendant Roger Ko ("Ko") was at all relevant times a director of S-B during the

5   Relevant Purchase Period and was an officer and director of Tarium Kolin Ltd, (Kolin") a major

6   shareholder of S-B and major supplier to S-B. During the Relevant Purchase Period, Ko caused

7   S-B to issue over a dozen bullish, but materially false and misleading, press releases and Form

8   10 Qs and prospectuses.  Ko signed the Company's periodic financial reports on Form 10K and

9   Registration Statements issued during the Relevant Purchase Period which were filed with the

10  Securities and Exchange Commission. Ko was privy to true information concerning the phony

11  transactions between S-B and, among others, South China House of Technology and Taiwan

12  Kolin Co. Ltd. Notwithstanding that knowledge, Ko allowed S-B's financial statements to falsely

13  reflect those transactions which rendered the financial statements issued by SB during the

14  Relevant Purchase Period materially false and misleading.

15       82.    Messrs. Sollitto, Li, Chow, Hodgson, Pratt, Liu and Ko are collectively referred to

16  as the "Defendants."

17       83.    Defendants, by reason of their direct and substantial management positions and

18  responsibilities during the time relevant of this Complaint, their respective ownership positions in

19  S-B and S-B's major suppliers, were "controlling persons" of S-B within the meaning of Section

20  20 of the Exchange Act and had the power and influence to control S-B and exercised such

21  control to cause the Company to engage in the violations and unlawful practices complained

22  of herein. Defendants, because of their positions as officers and directors of S-B, had access to

23  adverse non-public information about the true Company's financial condition and future

24  prospects.

25       84.    The statements made or caused to be made by Defendants as alleged below were

26  materially false and misleading when made.  Defendants had no reasonable or adequate basis to

27  justify or support the statements.  The true financial and operating condition of S-B, which was

28  known or recklessly disregarded by Defendants, remained concealed from the plaintiffs and the

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

1  investing public.  Defendants were under a duty to disclose those facts but instead

2  misrepresented or concealed them during the relevant period herein.

3  **SUBSTANTIVE ALLEGATIONS**

4  **A.  BACKGROUND: Syntax And Brillian Merge Into A Publicly Traded Company**
5  **With The Syntax Owner's Group Retaining Control Over the Combined Company**

6      85.    On November 30, 2005, Brillian completed a merger with Syntax Groups

7  Corporation, a privately held California corporation.  At the time of the merger, Brillian was a

8  public company which had been spun off from another public company, Three Five Systems,

9  Inc., in September 2003.

10     86.    Prior to the merger, Brillian was a designer and developer of large screen rear

11 projection high definition televisions using its proprietary LCoS (liquid crystal on silicone micro

12 display) technology.  According to its public statements, Brillian was also a marketer of HDTV

13 products under the brand name of certain retailers.  In public statements Brillian stated that it had

14 a "virtual manufacturing model utilizing third party contract manufacturers to produce its

15 products."  After its spin-off, Brillian was never profitable and never generated positive cash

16 flow and as such was completely dependant on outside funding to operate.  In its last full year of

17 operation before the merger with Syntax, Brillian's revenues were approximately $2.7 million

18 and its net losses were approximately $33 million.  Brillian publicly represented that as of June

19 30, 2005, it believed it could be unable to continue as a going concern for a reasonable amount of

20 time.

21     87.    Syntax was incorporated on April 21, 2003 as a California corporation.  Syntax, at

22 the time of the merger, represented that it was a designer, developer, manufacturer and

23 distributor of high definition televisions in LCD and LCoS formats under the brand name Olevia

24 for the commercial home entertainment and home theater markets.  According to Syntax' own

25 description, Syntax products were available through leading regional and national consumer

26 electronics retailers, on line retailers, and high end boutique audio-visual integrators and

27 retailers, Syntax' product line at the time of the merger included flat panel LCD models in 20

28 inch to 42 inch sizes and a recently introduced LCoS 50 inch model.  In the second quarter of

13

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

fiscal 2004, Syntax changed its business focus to concentrate on the sale of LCD TV products. In the third quarter of fiscal 2004, Syntax introduced its first LCD and LCoS HDTV products. Sales of LCD and LCoS TV products now account for all of Syntax's revenue.

88.     During the fiscal year ended June 30, 2005 ("FY 2005"), Syntax recorded revenue of $82.6 million, a 170% increase from the previous year and a net loss of $17,000 compared with a net loss of $605,000 in the previous year.

89.     As of mid 2005, Syntax distributors included BDI Laguna, Inc. which distributed Syntax's products for resale through BuyRite Electronics, C4Sure, HSN, RadioShack.com, and Staples.com and Tech Depot.com and PCProTrading and CompUSA Inc.  For the year ended June 30, 2005, sales to BDI Laguna, Inc., PC PRO Trading Limited, and CompUSA, Inc. accounted for approximately 19.9%, 15.9%, and 15.8%, respectively, of Syntax's revenue. Syntax also distributed its products through a Hong Kong distributor, South China House of Technology.  But, as of mid 2005, SCHOT was not one of Syntax's major distributors.

90.     In conjunction with Syntax' plans to expand its product lines to include LCD TVs, Syntax entered into a manufacturing arrangement with Kolin.  Kolin is a Taiwan publicly-listed company which is a provider of digital monitors and LCD and LCoS high-definition and high-resolution televisions.  Under that agreement, Kolin produced certain of the electronic components and subassemblies of Syntax's LCD and LCoS televisions.

91.     In March 2004, Syntax and Kolin also entered into three additional agreements that provide for rebates to Syntax on purchases from Kolin for technical development in the amount of 3%, market development in the amount of 2.5%, and volume incentive purchases in amounts ranging up to 2.75%.  The foregoing rebates issued by Kolin are issued monthly based on units shipped.  Syntax also entered into an additional agreement intended to govern the terms pursuant to which Kolin, Syntax, and DigiMedia Technology Co, Ltd., ("DigiMedia"), the product research and development subsidiary of Kolin, would form a strategic alliance through the acquisition by Kolin of up to 10% of the common stock of Syntax and the acquisition by Syntax of up to 10% of the common stock of DigiMedia.  As a result of the foregoing, Kolin and DigiMedia became related parties of S-B.

14

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

92.     Even before Syntax and Brillian merged, Kolin was increasing its ownership of Syntax. As of June 30, 2005, Kolin had purchased 2,034,683 shares of Syntax common stock, representing 9.73% of the outstanding stock of Syntax. At one point Kolin's ownership interest in S-B reached approximately 12%. According to its own public statements, at the time of the merger, Kolin was Syntax's sole source supplier of most components and sub-assemblies used by Syntax. Thus, Kolin, a sole source supplier to Syntax and a major owner of its stock, was in a position to dictate terms to Syntax that were more favorable to Kolin than to Syntax. Eventually S-B's cash resources would be siphoned out of S-B to Kolin and undermine S-B's business and deplete its assets.

93.     Prior to the merger, Syntax was principally owned by Tony Ho (16.64%); Chow (12.16 %); Liu (10.07%); Kolin (9.12 %); Li (3.64 %); Patrick Ng (2.43 %) and Michael Chan (1.71%).

94.     The exchange rate of the merger was calculated so that former shareholders of Syntax owned approximately 70% of the fully diluted shares of combined company after the merger.

95.     Immediately after the merger, Li owned 2.9 % of S-B; Chow owned 9.6 %; Chan owned 4.7%, Liu owned 7.3%; Ho owned 13.1%; Lau owned 7.9% and Kolin owned 7.2 %. Thus, even after the merger, the majority owners of Syntax continued to be majority owners of S-B and controlled S-B.

**B.  After The Merger, S-B's Relationship With Kolin Dominates S-B**

96.     S-B's Asian business came to overwhelm S-B. For the quarter ended December 30, 2005, S-B's net sales in North America were approximately 88% of sales while net sales in Asia were only 12.6 % of total sales for the six months ended December 31, 2005. S-B stated that, in Asia, it sold its televisions exclusively through South China House of Technology ("SCHOT"), its sole Asian distributor. By the end of fiscal year 2006 (June 30), S-B's reported North American sales was $156.9 million and Asia sales were $35.7 million, thus S-B sales to Asia constituted approximately 19% of S-B total annual sales.

15

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

97.   During fiscal year 2006, S-B's cash was siphoned off by Kolin.  At June 30, 2006, S-B reported that it had a "deposit" with Kolin of approximately $5.06 million compared to $847 thousand at same time the prior year.  During fiscal year 2006 ended June 30, 2006, S-B "purchases" from Kolin were $223.6 million (up from $9.3 million in fiscal year 2004) despite the fact that S-B total sales were only $192.9 in fiscal year 2006.  Kolin S-B obscured the flow of cash from S-B to Kolin by issuing credits to S-B pursuant to the rebate and other cost shifting agreements between Kolin and S-B.  According to S-B's former Corporate Controller and Chief Accounting Officer, Kolin issued purchase credits to S-B in exchange for cash.  Throughout the Relevant Purchase Period, S-B used the rebate agreements and other cost shifting agreements to obscure its cash transfers to Kolin.

98.   Notwithstanding the true nature of S-B's business transactions with Kolin and SCHOT, on July 12, 2006, defendants caused S-B to issue a bullish but materially false and misleading press release which, inter alia, misrepresented S-B's financial operations and financial condition and provided a materially false and misleading statement about S-B's projected revenues, income and earnings.  Defendant Pratt was quoted in the press release. He made materially false and misleading statements that press release.  The release was subsequently filed with the SEC in a Form 8-K signed by Pratt.  The issuance of that press release caused the price of S-B stock to jump from a close of $2.74 per share to a close of $3.75 per share on July 12, 2006.

**C. During S-B's Fiscal Year 2007 ( Beginning July 1, 2006 and Ended June 30, 2007) S-B's Financial And Other Reports Concealed Kolin's Siphon Of S-B's Cash Resources While Defendants Keep S-B's Stock Price Propped Up With False Statements About S-B's Business And Financial Condition**

99.   On August 22, 2006 , defendants caused S-B to issue a bullish but materially false and leading press release in which Solitto provided materially false and misleading projections of S-B' projected revenues and income and gross margins. That press release was subsequently filed with the SEC in a Form 8-K signed by Pratt. In the next ten trading days following the issuance of that release, the price S-B soared from $3.68 per share to approximately $4.80-per share.

16

100.   On October 12, 2006, defendants caused S-B to issue a bullish but materially false and leading press release in which Pratt provided materially false and misleading projections of S-B' projected revenues and income and gross margins. That press release was subsequently filed with the SEC in a Form 8-K signed by Pratt. In the next seven trading days following the issuance of that release, the price S-B rose from $5.58 per share to approximately $5.93 per share.

101.   On or about September 13, 2006, Defendants caused S-B to release its Annual Report on Form 10-K for the annual period ended June 30, 2006. That 10K repeated the materially false and misleading financial information described in paragraphs and 94 and 95.

102.   On October 20, 2006, Defendants caused S-B to file its Form 10-K/A with the SEC (amending its September 13, 2005 Form 10-K filing) (which was signed by Sollitto and Pratt), in which it reported its financial results for its fiscal year ended June 30 2006 ("FYE 2006"), specifically reporting (a) net sales of $193 million (up 134% from fiscal year ended 2005); (b) accounts receivable from SCHOT of $27.5 million (constituting 54% of SB's total accounts receivable); (c) net inventory of $13 million; and (d) deposits with Kolin of $5 million.

103.   On November 2, 2006 , defendants caused S-B to issue a bullish but materially false and leading press release in which Sollitto provided materially false and misleading projections of S-B' projected revenues and income and gross margins and S-B's first quarter fiscal year 2007 financial results . That press release was subsequently filed with the SEC in a form 8-K signed by Pratt. On the day of the issuance of that release, the price of S-B soared from $ 6.26 per share to $7.84 per share.

104.   By September 30, 2006, S-B sales in Asia were over 60% of S-B's total sales for that quarter.  S-B's "deposits" with Kolin, previously described as "deposits for TV purchases" were now described in SEC filing as "a deposit with Kolin for molds used in the manufacture of our LCD televisions."  The deposit reportedly made in the September 30, 2006 quarter was $22.6 million representing a whopping 20% of the purchases by S-B from Kolin in that quarter, despite the fact that in fiscal year ended June 30, 2006, deposits with Kolin represented only 2 ½% of purchases from Kolin.

105.   In sworn testimony, S-B interim COO and CEO, Greg Rayburn has admitted that there was no documentation at S-B to support the "tooling deposit" cash transfers to Kolin and that there were no "tooling deposits" reflected at S-B.

106.   On November 8, 2006, defendants caused to be issued S-B's Quarterly Report on Form 10Q for the quarterly period ended September 30, 2006 signed by Pratt which contained the materially false and misleading financial information described above. The Form 10Q contained materially false and misleading certifications by Sollitto and Pratt attesting to S-B's financial controls and the integrity of S-B's reported financial statements.

107.   On January 8 , 2007 , defendants caused S-B to issue a bullish but materially false and leading press release in which Pratt  provided materially false and misleading projections of S-B' projected revenues and income and gross margins. That press release was subsequently filed with the SEC in a Form 8-K signed by Pratt. In the trading day following the issuance of that release, the price S-B soared from a close of $9.20 per share the previous day to an intra-day high of $11.77 per share.

108.   By the quarter ended December 31, 2006, S-B's quarter sales had increased to 242,458,000 of which 134,161,000 were sales in Asia. The deposit with Kolin had increased to $26.253 million by the end of the quarter. The tooling deposits in that quarter increased by approximately $6 million from the end of the previous quarter fiscal quarter of 2007 despite the fact that S-B's purchases form Kolin in the 2nd quarter were only approximately $20 million.

109.   For the six-months ended December 31, 2006, "tooling deposits" paid by S-B to Kolin amounted to $42.6 million while "vendor rebates, price protection, and other credits" issued back to Syntax-Brillian from Kolin amounted to $43.9 million. For the three-months ended September 30, 2007, "tooling deposits" paid by S-B to Kolin amounted to $60.1 million while "vendor rebates, price protection, and other credits" issued back to S-B from Kolin amounted to $38.3 million.

110.   On February 8, 2007, S-B, in a Form 8-K signed by Pratt, released its financial results for the second fiscal quarter of 2007 for the quarter ended December 31, 2006 ("Second Quarter 2007"), and reported (a) revenue of $242.5 million (up 303% from second quarter 2006);

18

(b) net income of $14.8 million (compared with a net loss of $1.3 million for the second fiscal quarter of 2006); and (c) accounts receivable of $123.5 million from SCHOT (reflecting a $70.1 million increase, or more than 130%, from the prior fiscal quarter).  In conjunction with these results, defendant Sollitto, S-B's CEO at the time, stated that "I am extremely pleased with the performance of our team this quarter . . . Revenue and earnings hit new records as sell-through of the Olevia brand at the retail level continues to exceed our expectations and we expand distribution into new national channels." In the two trading days following the release, the price of S-B's stock rose from $7.99 per share to $8.67 per share.

111.    On February 14, 2007, S-B filed its Form 10-Q with the SEC for the Second Quarter 2007, which was signed by defendants Sollitto and Pratt and repeated the financial results previously announced in S-B's Form 8-K.  The 10-Q stated that "[t]he accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S-X . . . In our opinion, all adjustments, which include only normal recurring adjustments, necessary to present fairly the financial position, results of operations, and cash flow for all periods presented have been made."

112.    In its Second Quarter 2007 10-Q, S-B also indicated that for the first six months of fiscal year 2007 ended December 31, 2006, its cash flow from operations was a negative $46.5 million.  Specifically, S-B stated that "[t]he operating cash outflow during the six months ended December 31, 2006 was primarily the result of increases in account receivables and inventories ...," and assured the public that "[w]e believe that the cash from operations and the increased credit facilities will be sufficient to sustain operations at the current level for the next 12 months."

113.    In its Form 10-Q S-B also reported that Net sales to Asia for the three months ended December 31, 2006 totaled over $134 million.  Sales to Asia for the same period in 2005 were reported at $7.5 million.  On this news, S-B stock rose over 9% from $7.47 to $8.16 per share on the next day of trading.

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

114.    S-B's Second Quarter 2007 Form 10-Q also contained certifications signed, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), by Defendants Sollitto and Pratt that stated, in relevant part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

115.    On April 12, 2007 , defendants caused S-B to issue a bullish but materially false and leading press release in which Pratt  provided materially false and misleading projections of S-B' projected revenues and income and gross margins. That press release was subsequently filed with the SEC in a Form 8-K signed by Pratt.

116.    On May 2, 2007, defendants caused S-B to issue a bullish but materially false and leading press release in which S-B announced that it had obtained bridge financing in the amount of $20 million from CIT, pursuant to a term loan agreement coming due the earlier of September 30, 2007 or S-B's receipt of other financing.  According to defendant Sollitto, the bridge loan was to provide working capital to fund general corporate programs and to enable the Company to meet growing demand for its product in the markets globally. That press release was subsequently filed with the SEC in a form 8-K signed by Pratt. In the next 5 trading days following the issuance of that release, the price S-B soared from $7.47 per share to approximately $8. 59 per share.

117.    On May 10, 2007, after the market closed, S-B issued two press releases.  The first announced financial results for the third fiscal quarter ended March 31, 2007.  Defendant Sollitto stated, "I am extremely pleased with the results this quarter.  The success of our advertising campaigns has resulted in increased demand for our Olevia HDTVs and, therefore, our revenue outlook for the full calendar year has now been increased to a range of $975 million to $1.1 Billion."

 Also on May 10, 2007, S-B released  its results for the third fiscal quarter of 2007 for the quarter ended March 31, 2007 ("Third Quarter 2007"), and reported (a) revenue of $162.9 million (up 257% from the prior year); (b) net income of $5.5 million (compared with a net loss of $11.4 million for the third fiscal quarter of 2006); and (c) accounts receivable of $170.8 million from SCHOT (the accounts receivable owed to S-B from SCHOT increased by $47.3 million from the

20

prior fiscal quarter and sales to SCHOT accounted for 39% of the company's total revenue). In connection with these results, Sollitto stated that "I am extremely pleased with the results this quarter ... our revenue outlook for the full calendar year has now been increased to a range of $975 million to $1.1 billion." By the nine months ended March 30, 2007, S-B's sales had increased to $492.4 million and its purchases from Kolin were reported $456 .899 million and tooling deposits had risen to approximately $40 million.

118.    Also on May 10, 2007, defendants Sollitto and Pratt held a conference call with investors to discuss results for the third fiscal quarter.  On the call, Pratt reiterated that, "for the calendar year, ending December 31, 2007, we anticipate consolidated revenue to be in the range of $950 million to $1.1 billion with consolidated gross margins in the range of 16 to 18%." Additionally, Pratt stated that, "as of May 9, approximately $69 million of invoices from South China House of Technology ("SCHOT") are past due and our total outstanding receivable balance from SCHOT was down to $133.2 million.  The delay in collections from SCHOT is driven by seasonal delays from SCHOT's China retailers.  In the past two weeks [,] the rate of payments has increased significantly."

119.    Defendant Sollitto also stated that, "while April was a difficult month for our channel partners, with widespread allocation constraints, the bridge loan from CIT and the steady inflow of our payments from our China and domestic sales had allowed us to update our outlook for the June quarter.  I believe we will be able to satisfy upside demand across most of the global channel beginning in July."

120.    The second press release, issued after the market closed on May 10, 2007, announced that the Company, "plans to offer approximately $150 million and certain of its stockholders plan to offer approximately $22 million of shares of [S-B] common stock in an underwritten public offering."

121.    In its Form 10-Q filed on May 11, 2007, S-B reported that net sales to Asia for the three months ended March 31, 2007 totaled over $67 million.

122.    Additionally, S-B's Form 10-Q filing contained SOX certifications signed by defendants Sollitto and Pratt attesting that the report "does not contain any untrue statement of a

21

1   material fact or omit to state a material fact necessary to make the statements made, in light of

2   the circumstances under which such statements were made, not misleading with respect to the

3   period covered by this report;" and that, "the information contained in the Report fairly presents,

4   in all material respects, the financial condition and results of operations of the Company."

5       123.    Moreover, the Form 10-Q stated that (a) "[t]he accompanying unaudited

6   condensed consolidated financial statements have been prepared in [GAAP] applicable to interim

7   financial information and the instructions to Form 10-Q and Article 10 of Regulation S-X . . . In

8   our opinion, all adjustments, which include only normal recurring adjustments, necessary to

9   present fairly the financial position, results of operations, and cash flow for all periods presented

10  have been made"; and (b) "[t]he information contained in the Report fairly presents, in all

11  material respects, the financial condition and results of operations of the Company ... As of the

12  end of the period covered by this report, our Chief Executive Officer and Chief Financial Officer

13  have reviewed and evaluated the effectiveness of our disclosure controls and procedures, which

14  included inquiries made to certain other of our employees.  Based on their evaluation, our Chief

15  Executive Officer and Chief Financial Officer have each concluded that our disclosure controls

16  and procedures are effective and sufficient to ensure that we record, process, summarize, and

17  report information required to be disclosed by us in our periodic reports filed under the Securities

18  Exchange Act within the time periods specified by the Securities and Exchange Commission's

19  rules and forms.  During the quarterly period covered by this report, there have not been any

20  changes in our internal control over financial reporting that have materially affected, or are

21  reasonably likely to materially affect, our internal control over financial reporting."

22      124.    The financial statements made in the quarterly report filed with the SEC were

23  false and misleading when made because the Company in fact, as it later admitted, lacked

24  adequate internal controls and was therefore unable to ascertain its true financial condition and

25  incorrectly accounted for its warranty and income tax expenses in the third quarter ended March

26  31, 2007.

27      125.    During a conference call on May 10, 2007 with analysts and investors to discuss

28  the company's financial results, in response to an analyst questioning the assumptions that led to

22

the full year revenue guidance of $975 million to $1.1 billion, Sollitto responded, "the outlook

that we have, I think we are being very conservative here and we should, is based on our current

forecast from our current channel partners.  We do believe that there is significant upside which

is obviously why we are looking to finance at a faster rate, in just receivables growth."

126.    Analyst John Vinh of C.E. Unterberg, Towbin, inquired further, "I see, you think

you can take – this is achievable through organic growth currently?"  Defendant Sollitto replied,

"yes."

127.    Ted Jackson, an analyst from Cantor Fitzgerald asked defendant Sollitto, "but

would your contracts relative to your panel suppliers cover the – your – I mean essentially your

guidance that you have given for the year?"  "<A>Yeah."  "<Q> You would not have to go out

in the spot market?"  "<A> No we don't and in fact we have been approached by the panel

manufacturers to offer increases in our contracts."

128.    In response to a question from Brian Alger, an analyst with Stratos Capital, who

asked about maintaining gross margins should panel prices rise, defendant Sollitto responded

that, "these are contracts that James Li actually measures and monitors on a monthly basis."

129.    In a follow-up, Mr. Alger asked, "right, so is this combination of things and just

so I understand the dynamic here, the contract you have with your panel suppliers aren't

necessarily at a fixed price but for a certain amount of volume over the year, and then if just as a

follow up to the previous question if panel prices were to G-d forbid to go up is there a true up

on the contract where you might actually have to kick back additional money ...?"  <A> No, I

mean we never see this a lot since they never happen.  Never say never.  We haven't ever seen a

case of where our prices went up on the contract side.  What happens is that we have a

commitment to certain pricing and that pricing has measurements against the industry pricing.

And each quarter is reviewed to ensure that we are paying below that industry pricing.  When

they talk about panel prices going up, remember what they are really doing is they are increasing

panel prices on the spot market which represents about 5% of the total supply in an effort to try

to hold prices, for the – on panels in general."

23

130.   Defendants also announced on the conference call their intention to conduct a $150 million underwritten public offering.

131.   On May 11, 2007, S-B filed a Form 12b-25 with the SEC requesting additional time to file its quarterly report for the period ended March 31, 2007.  Although S-B completed its acquisition of Vivitar, a provider of cameras and digital imaging equipment, on November 21, 2006, S-B curiously stated that the acquisition was the reason for its inability to timely file its quarterly report.  When S-B did file its Form 10-Q with the SEC for its fiscal 2007 third quarter ended March 31, 2007, S-B reported that revenues for the Third Quarter 2007 increased by $117.2 million (257%) to $162.9 million from $45.7 million in the third quarter of 2006.  Year-to-date revenue was $492.4 million, up 270% from revenue of $133.2 million for the nine months ended March 31, 2006 and net income with GAAP for the quarter was $5.5 million compared with a net loss of $11.4 million for the third quarter of 2006.  GAAP net income for the nine months ended March 31, 2007 was $21.4 million compared with a net loss of $13.4 million for the comparable period of the previous year.  GAAP diluted net income per share was $0.09 for the third quarter of fiscal 2007, compared with a diluted net loss per share of $0.26 for the third quarter of fiscal 2006.

132.   On May 14, 2007, S-B announced that it had filed a prospectus supplement to its "proposed underwritten public offering of 25,608,695 shares of its common stock, consisting of 23,000,000 shares to be issued by the company and 2,608,695 shares to be sold by certain of its stockholders.  In connection with the offering, [S-B] and the selling stockholders also plan to grant the underwriters an option to purchase up to an aggregate of 3,841,305 additional shares of common stock.  Net proceeds to [S-B] are intended to be used to finance the working capital needs associated with continued expansion of its business, to repay $20.0 million of outstanding indebtedness, and for other general corporate purposes."

133.   On March 29, 2007, Kolin acquired an additional 3 million shares and 750,000 warrants to purchase exercisable at $5.00 per share for 5 years.  Kolin S-B common stock paid less than $5 per share for the 3 million shares it acquired.  That purchase brought Kolin's direct and indirect ownership of S-B stock to approximately 6.8 million shares.

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

134.    On May 29, 2007 Kolin sold 1 million of S-B shares in the underwritten public offering at $5.75 per share.  Defendant Liu, Kolin's President and one of its directors sold 869,565 shares of S-B stock in the offering.

135.    On May 24, 2007, the Company filed a prospectus supplement with the SEC on behalf of itself and certain selling shareholders offering over 25.6 million of S-B shares.  The prospectus supplement noted that in conjunction with the offering, the Company would receive $143,343,130.  The prospectus noted that the Company "incorporate(s) by reference into this prospectus supplement the . . . Form 10-Q/A for the quarter ended March 31, 2006 filed with the SEC on October 20, 2006, Form 10-Q/A for the quarter ended September 30, 2006 filed with the SEC on February 16, 2007, Form 10-Q for the quarter ended December 31, 2006 filed with the SEC on February 14, 2007."  Each of the quarterly reports incorporated by reference in the prospectus contained SOX certifications by defendants Sollitto and Pratt attesting that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

136.    The information contained in the prospectus concerning financial information for the first three quarters of fiscal year 2007 was false and misleading when made because S-B lacked adequate internal controls and was therefore unable to ascertain its true financial condition and incorrectly accounted for its warranty and income tax expenses.

D.    **S-B's Fraudulent Transactions With SCHOT And Kolin Reach A Crescendo By S-B Fiscal Year End 2007 (June 30, 2007)**

137.    On July 16, 2007, before the market opened, the Company issued a press release with the title, "Syntax-Brillian Corporation Provides Quarter-end Outlook and Updates Calendar-Year Revenue Guidance," that quoted Pratt as stating, "during the quarter ended June 30, 2007, we collected $129.6 million of cash from South China House of Technology [SCHOT], our Asian distributor, and as of June 30, 2007 there were, as expected, no invoices

25

summarize

1  outstanding for more than the stated 120-day terms.  Finally, we continue to experience strong

2  demand for our products and have had success penetrating additional retail accounts during the

3  first half of 2007.  As a result of this strong demand and the deployment of the proceeds of our

4  public stock offering in May as well as the cash from the accounts receivable collections, we are

5  raising our revenue outlook for the calendar year ending December 31, 2007 from our previous

6  range of $950 million to $1.1 billion to a revised range of $1.1 billion to $1.3 billion." For the

7  fiscal year ended June 2007, S-B reported that it earned approximately 48% (approximately $336

8  million) of its revenue from sales to SCHOT.

9          138.    The guidance provided on July 16, 2007 was the second guidance update S-B

10  issued for the calendar year ended December 31, 2007 in less than five months.  On the heels of

11  the updated guidance, the price of S-B stock increased from $5.56 to $6.61 on trading volume of

12  17.6 million shares, over five times the average trading volume.

13          139.    S-B's reported financial results for the Third and Fourth fiscal quarters of 2007

14  (ended March 31, 2007 and June 30, 2007 respectively) were inflated by inclusion of sales of

15  SCHOT which defendants knew were  not eligible for inclusion as revenues in S-B's reported

16  financial results until and unless S-B was paid for the purported order of 65 inch Chinese

17  Olympic televisions.

18          140.    Moreover, according to Global Sources (web published information

19  (www.globalsources.com/schot.co)), SCHOT had total annual sales of only USD 20 million to

20  25 million.

21  *See* http://schot.manufacturer.globalsources.com/si/6008800555800/Homepage.htm10.29.07

22  (The site represents that it is current as of October 8, 2007 and that it has verified the information

23  on the page via regular supplier visits).

24          141.    In fiscal year 2007, S-B transferred $471.9 million to Kolin for "contract

25  manufacturing services and electronic components and subassemblies."

26          142.    According to a confidential witness quoted in the Amended Complaint in a

27  securities class action suit filed in the United States District Court for the District of Arizona, S-

28  B sent money to Kolin without any documentation of the purpose of the transfer.  Defendant Li

26

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

1   was reportedly in control of the S-B – Kolin relationship. At a hearing in the United States

2   Bankruptcy Court for the District of Delaware, S-B's interim COO testified in essence that

3   monies transferred from S-B to Kolin simply disappeared.

4          143.   On August 23, 2007, before the market opened, S-B issued two press releases.

5   One press release announced that the Company would announce its results for the fourth quarter

6   and fiscal year 2007 ended June 30, 2007 on September 11, 2007.

7          144.   The second press release, titled, "Syntax-Brillian Announces $20 Million

8   Strategic Investment, Three-way Alliance with TECO and Kolin," stated in pertinent part:

9          Syntax-Brillian Corporation (Nasdaq:BRLC) announced today that it has raised
           approximately $20 million in a strategic financing with Taiwan-based TECO
10         Electric & Machinery Co., Ltd.

11         The investment comprises 3,083,945 shares of common stock priced at $6.4852
           per share.   There were no warrants issued in connection with this strategic
12         financing.

13         In addition to the financing transaction, Syntax-Brillian, Taiwan Kolin Company
           Limited, and TECO have entered into a three-way alliance wherein Kolin will
14         oversee the supply-chain management and product development platform of
           various TECO branded products for distribution in Taiwan as well as other
15         regions of the world that all three companies agree to enter.   TECO will also
           provide supply-chain financing of up to $100 million for the purchase of key
16         components in support of Olevia(TM) branded LCD TVs.9993

17         The investment and the associated off-balance-sheet supply-chain financial
           support provide capital to continue Syntax-Brillian's growth, including expanding
18         its manufacturing base and supporting the company's efforts to continue elevating
           awareness of the Olevia(TM) brand among consumers worldwide.

19
       **E.      Some Of The Truth Emerges On September 12, 2007**
20
          145.   Before the market opened on September 11, 2007, S-B announced that it was
21
    delaying the release of its financial results until the following day.  That day, Bloomberg News
22
    quoted an analyst with Canaccord Adams, one of the co-managers of the S-B offering, as saying,
23
    "we were taken aback by the surprise and haven't been able to get in touch with management."
24
    The price of S-B stock dropped from $6.80 to $6.29.
25
          146.   After the market closed on September 12, 2007, S-B reported its results for the
26
    year-end and fiscal fourth quarter 2007 ended June 30, 2007 ("Fourth Quarter 2007") as follows:
27
    (a) revenue was $205.3 million and net income was $8.4 million (which met expectations); (b)
28

                                                 27

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

account receivables from SCHOT was $138.1 million, with none of the receivables purportedly more than 120 days past due; and (c) S-B had $78.1 million outstanding under its credit line as of June 30, 2007 which, according to a statement made by defendant Pratt in the follow-up conference call, was "virtually all of [S-B's] borrowing base capacity."

147.    For the first quarter 2008 ending September 30, 2007, S-B projected (a) revenue of $170 to $180 million, which was significantly below S-B's prior projection of revenues of $254 million; (b) shipments of LCD televisions of between 270,000 to 290,000 units; and (c) projected revenues for calendar year 2007 of $1.0 to $1.1 billion, which was significantly below S-B's previous guidance given just two months earlier, when S-B projected revenues of $1.1 to $1.3 billion.

148.    Within this same press release, S-B announced that its control assessment pursuant to Section 404 of the SOX had found "that our methodology to estimate warranty accruals did not adequately reflect information that had recently become available," resulting in "in the reversal of approximately $7.4 million of warranty expense which had been recorded in cost of sales through the third quarter of fiscal 2007."

149.    S-B reported that "we also determined that the tax impact of dividends and accretion of discount on redeemable, convertible preferred stock, which are reported as interest expense under GAAP, cannot be treated as deductible in our income tax provision which resulted in approximately $5.9 million of income tax that should have been recorded through the third quarter of 2007 being recorded in the fourth quarter."

150.    S-B also reported that "accounts receivable at June 30, 2007 was $138.1 million of accounts receivable from South China House of Technology [SCHOT].... Accounts receivable and due from factor, excluding the Asian receivables, totaled $72.0 million which represents approximately 60.5 DSOs at June 30, 2007 compared with ... 46.7 DSOs at March 31, 2007."

151.    On a conference call to discuss this press release, defendant Pratt also revealed that the Company would, "take a cautious approach to sales in Asia." Defendant Sollitto stated that, "the Olevia brand continues to enjoy demand beyond our plan and as a result, we are working hard to allocate product to our best channel partners and evaluate growth financing

28

alternatives. [A]s we sit here today, we find our growth limited by our current level of working capital. We anticipate continuing to take share in North America with growth over three times the national average, as we entered some of the premier national big box retailers. We will however scale back our growth for now in China and focus our limited working capital on North American sales." However, the "credit crunch" excuse was just contrived to conceal the fact that demand for S-B's products was decreasing dramatically.

152. On the call, Merrill Lynch analyst Steven Fox asked, "But how realistic is the sales level given what you talked about in terms of financing constraints? Are you anticipating that some of those constraints are gone in the December quarter, or that you're going to be able to have – I'm just not following ..." Defendant Pratt replied, "the real issue is how quickly can we get the financing in place or what are our financing capabilities in our supply chain to get the panels, and that is what is restricting us right now. So it's not an issue of can we finance it after the sale happens. This is predicated upon with our current financing and our supply chain partners' current financing, how much product we can actually get here."

153. Another analyst asked, "I was wondering if you could give us a little bit more visibility into the end demand outlook in the U.S., especially at these big-box retailers. Are you seeing any impacts from the credit crunch from those or are you guys still supply constrained even to the U.S. retailers?" Defendant Sollitto replied "we are still seeing a situation where our big-box retail customers have asked us to sign up to orders that are on the order of three times higher than we are willing to commit. Those continue to come in. We do continue to discuss with those big-box retailers the methods by which we could increase their sourcing. But for right now the demand for Olevia is still significantly higher than we are able to provide." Sollitto later added "as I mentioned earlier, we have standing orders from at least half a dozen national retailers for substantially more product than we have currently in our pipeline. We have been approached by several of the panel manufacturers and asked if we would like additional allocation. Of course, we'd love to have additional allocation if we are able to finance that." Defendant Sollitto, acknowledging the difficulty in timely collecting the Chinese account receivables, indicated that S-B would try to begin direct sales in China "because of the fact that

29

1  we believe that it's prudent for us at this instant in time to limit the amount, the absolute value of

2  the accounts receivable that will be on 120 day terms....the revenue will be directly ours and then

3  we will be able to finance that directly through Chinese banks." In its 10-K S-B reported that,

4  "we had a backlog of orders of $42.4 million at fiscal year end June 30, 2007 as compared to no

5  material backlog of orders at fiscal year end June 30, 2006."

6       154.   Also on September 12, 2007, S-B announced that defendant Pratt "will resign

7  effective September 30, 2007." An 8-K filing with the SEC revealed that S-B had known of this

8  information since September 6, 2007. In an article on the SmartMoney website, analyst John

9  Vinh was quoted as saying, "if you're the CFO of a good company and you have good prospects

10  ahead of you and you're expanding your distribution channels, why would you want to leave?"

11       155.   Contrary to defendants' statements asserting otherwise, outside auditor Ernst &

12  Young, after conducting an internal audit of the company's internal controls and policies,

13  concluded in its report ("E&Y Report") that S-B's financial reporting systems were rife with

14  several material weaknesses and deficiencies that needed to be corrected, stating that:

15       In our opinion …, Syntax-Brillian Corporation has not maintained effective
         internal control over financial reporting as of June 30, 2007, based on the COSO
16       criteria.

17  Based on this report, S-B's stock price plunged to a price of $2.12 per share, a loss of 34.6% of S-

18  B's value.

19       156.   The Form 10-K also revealed that the Company, contrary to its executive officers'

20  prior certifications, was significantly deficient and suffering material weaknesses in its internal

21  controls over its financial reporting. The Form 10-K stated in relevant part, at Item 9a:

22       Our management concluded that our internal control over financial reporting was
         ineffective as of June 30, 2007 because of the following material weaknesses:
23

24       Inventory Process — Controls over physical inventory receiving, counting and
         movement as well as inventory cut-off, and valuation were inadequate.

25       Revenue Process — Controls over the revenue recognition cut-off were
         inadequate. Our revenue cut-off procedures at June 30, 2007 improperly reversed
26       product in transit that should have been recorded as sales in the appropriate
         accounting period.

27

28

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

Income Tax Provision Process — Controls over the review and preparation of our income tax provision were inadequate. Our provision improperly understated our income taxes payable balance by a material amount.

Financial Statement Close Procedures — Our independent registered public accounting firm identified a number of adjustments which were in addition to those relating to the material weaknesses identified above. This has caused us to conclude that controls related to our analysis, evaluation, and review of the Company's 2007 financial information which gave rise to the adjustments has resulted in a material weakness. The specific control deficiencies consisted of:

- The review and analysis of the subjective areas of reserves and allowances has insufficient controls over certain subjective estimates in evaluating the propriety of the related ending balances. The review control did not call for a critical evaluation of the inputs that should be used in the estimation process to evaluate the propriety of the period ending balances which weakness resulted in material reductions to the related allowance for doubtful accounts and warranty reserve in the Company's 2007 financial statements.

- An inappropriate level of review of certain significant financial statement accounts and financial statement disclosures in non-subjective areas to verify the propriety of the recorded and reported amounts; insufficient analysis, documentation, review, and oversight of the financial statements of foreign subsidiary financial information during consolidation; and

- Insufficient staffing of the accounting and financial reporting function.

In aggregate, these control deficiencies result in a more than remote likelihood that a material misstatement to our annual or interim consolidated financial statements could occur and not be prevented or detected in a timely manner. The foregoing material weakness resulted in adjustments to certain accounts in the Company's 2007 financial statements, including fixed assets, other current and long-term assets, accounts payable, accrued liabilities and other operating expenses.

Because of the material weaknesses described above, management's assessment is a conclusion that, as of June 30, 2007, our internal control over financial reporting was not effective based on the COSO criteria. The effectiveness of internal control over financial reporting as of June 30, 2007 has been audited by Ernst & Young LLP, an independent registered public accounting firm.

157.   Ernst & Young's report also stated in relevant part:

### Report of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders of Syntax-Brillian Corporation

We have audited Syntax-Brillian Corporation's internal control over financial reporting as of June 30, 2007, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Syntax-Brillian Corporation's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control

31

over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

As indicated in the accompanying Management's Annual Report on Internal Control Over Financial Reporting, management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Vivitar, Inc., which is included in the 2007 consolidated financial statements of Syntax-Brillian Corporation and constituted $39.3 million and $20.7 million of total assets and net assets, respectively, as of June 30, 2007 and $41.4 million and $3.7 million of revenues and net loss, respectively for the year ended June 30, 2007. Our audit of internal control over financial reporting of S-B-Brillian Corporation also did not include an evaluation of the internal control over financial reporting of Vivitar.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment. Management has identified a material weakness in controls related to the company's inventory process, revenue process, reserves and allowances process,

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

income tax provision process and financial statement close procedures. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2007 financial statements, and this report does not affect our report dated September 7, 2007 on those financial statements.

In our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, Syntax-Brillian Corporation has not maintained effective internal control over financial reporting as of June 30, 2007, based on the COSO criteria.

/s/ Ernst & Young LLP
Phoenix, Arizona
September 12, 2007

158. S-B's accounting treatment of certain transactions and S-B's financial statements are being investigated by the SEC.

159. Canaccord Adams analyst Jed Dorsheimer, in a report titled "Accounting issues, CFO departure and credit fears too much to stomach," wrote that, "the timing of the missed guidance, accounting issues and the CFO departure will try even the most optimistic investors. Further, the short thesis — questioning the company's margins, lack of arms-length dealings with partners/suppliers and general accounting practices — appears to have somewhat come to fruition this quarter."

160. On these disclosures of inadequate financing, insufficient supplies of panels, and inadequate financial controls, the Company's stock price plummeted $2.12 (35%) from $6.13 to $4.01 on heavy trading volume of 36,337,811 million shares (nearly 14 times the average daily volume). After September 12, 2007, S-B's stock price recovered to almost $5 per share as the investing public believed that the only previously undisclosed material adverse information concerning S-B was some softness in demand and some defects in accounting systems which were being addressed. Thereafter however beginning on November 12, 2007 the price of S-B stock began a further decline after S-B disclosed that its fiscal year 2007 financial reports cannot be relied upon. Plaintiffs have suffered significant damages as result of Defendants' violations described herein.

161. SCHOT, an Asian electronics distributor, was S-B's largest customer, making up as much as 40% to 50% of total sales volume in some periods. S-B recorded revenue upon

33

1   shipment of products to SCHOT. These shipments and the related sales agreements did not meet
2   the criteria for revenue recognition, as shipping products to SCHOT amounted to nothing more
3   than consignment sales in Asia which allowed S-B to record revenue. SCHOT had no obligation
4   to pay for the products until they found an end-user customer and received payments themselves.

5        162.    Approximately 26,000 large screen HDTVs were purportedly "sold" to SCHOT
6   which were intended to be resold to the Chinese government for installation in the Olympic
7   Village in Beijing.  Those reported sales were included in Syntax publicly reported sales figures
8   and projections of revenues for calendar year 2008.  However, there was no firm commitment
9   from SCHOT to pay S-B for the televisions.  The Chinese government, however, refused to
10  accept the televisions and were returned to SCHOT and Kolin (who manufactured the televisions
11  on behalf of S-B).  In February 2008,  televisions were returned to S-B which S-B represented
12  were the return of televisions previously sold to SCHOT for delivery to the Chinese government.

13       163.    Under GAAP, S-B should not have reported any sales to SCHOT as revenue
14  because SCHOT did not have to pay for products until they were sold to end-user customers.

15       164.    Accordingly to a confidential witness quoted in an action pending in the District
16  Court of Arizona, SCHOT was not required by S-B to pay for product from S-B until it had been
17  resold.

18       165.    The magnitude of S-B's phony sales to SCHOT became evident in the next
19  quarter: the impact of no longer recording revenue upon shipment to SCHOT became apparent
20  when, for the quarter ended September 30, 2007, the Company announced that their new
21  revenue-recognition model caused $56.1 million worth of shipments to SCHOT be deferred as
22  revenue until the products were sold to end-user customers. Going forward, the change caused a
23  drastic 50% reduction in the Company's fiscal year 2008 revenue guidance. S-B also announced
24  that, excluding sales through its Chinese distributor, revenue expectations were $650 to $685
25  million – down from the original fiscal year 2008 revenue guidance of $1.1 to $1.3 billion.

26       166.    The statements made by defendants and issued on behalf of S-B, including press
27  releases and  statements contained within Forms 8-K, 10-Q and 10 K and incorporated into
28  Registration Statements and Prospectuses were materially false and misleading, or omitted to

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

1   state other facts necessary to make the statements made not misleading, because: (i) the

2   Company's reported revenue, net income, gross margins, accounts receivables and "tooling

3   deposits" and units sold were artificially inflated; (ii) S-B's transactions with SCHOT and Kolin

4   were not bona fide transactions; (iii) Kolin was siphoning cash from S-B; (iv) there was no end-

5   user demand for the products S-B "sold" to SCHOT;  (v) the Company's financial statements did

6   not fairly present, in all material respects, the financial condition and results of operations of the

7   Company; (vi) the Company's negative working capital and cash flow was caused by Kolin's

8   siphoning of cash from S-B and SCHOT's failure to pay for televisions that it received from S-B;

9   and (vi) the Company's cash from operations and credit facilities were not sufficient to sustain

10  operations.

11      167.    The defendants, as authors of the statements issued to the public and as

12  signatories to the Offering Documents, as directors, and/or officers and controlling persons of the

13  issuer, owed to plaintiffs the duty to become effective to ensure that all statements were true and

14  correct and that there was no omission of material facts required to be stated in order to make the

15  statements contained therein not misleading.  Defendants failed to do so and as such, defendants

16  are liable to the Class.

**PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

18      168.    Plaintiffs will rely, in part, upon the presumption of reliance established by the

19  fraud-on-the-market doctrine in that:

20          a.      Defendants made false and misleading statements of material fact, and

21  failed to disclose material facts during the relevant time period;

22          b.      the misstatements and omissions were material;

23          c.      the securities of the Company traded in efficient and open markets

24  (excluding the effects of fraud), the Company was followed by analysts;

25          d.      S-B's securities met the requirements for listing, and were listed and

26  actively traded on the NASDAQ; and

35

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

1    e.    the misstatements and omissions alleged would tend to induce a

2  reasonable investor to misjudge the value of S-B's securities.

3    169.    Plaintiffs purchased and sold S-B common stock between the time Defendants

4  misrepresented or failed to disclose material facts and the time the true facts were disclosed,

5  without knowledge of the omitted facts.

6    170.    Based upon the foregoing, plaintiffs are entitled to a presumption of reliance upon

7  the integrity of the market price for S-B's securities.

8                                    **NO SAFE HARBOR**

9    171.    The statutory safe harbor provided for forward-looking statements under certain

10  circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

11  Many of the specific statements pleaded herein were not identified as "forward-looking

12  statements" when made.  To the extent there were any forward-looking statements, there were no

13  meaningful cautionary statements identifying important factors that could cause actual results to

14  differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

15  extent that the statutory safe harbor does apply to any forward-looking statements pleaded

16  herein, Defendants are liable for those false forward-looking statements because at the time each

17  of those forward-looking statements was made, the particular speaker knew that the particular

18  forward-looking statement was false, and/or the forward-looking statement was authorized,

19  and/or approved by an executive officer of S-B who knew that those statements were false when

20  made.

21                                    **COUNT I**

22                    **Violation of Section 10(b) of the Exchange Act**
                  **and SEC Rule 10b-5 Thereunder Against All Defendants**
23
       172.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing
24
  paragraphs as if fully set forth herein.
25
       173.    This Count is asserted against Defendants and is based upon Section 10(b) of the
26
  Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R.
27
  §240.10b-5.
28

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

174.   Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiffs, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiffs to purchase S-B common stock at artificially inflated prices.

175.   Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

176.   As a result of the dissemination of the false and misleading statements set forth above, the market price of S-B common stock was artificially inflated.

177.   Plaintiffs relied, to their detriment, on the integrity of the market price of the stock in purchasing S-B common stock.  Had plaintiffs known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

178.   Plaintiffs have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

179.   By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiffs in connection with their purchases of S-B common stock.

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against All Defendants

180.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

181.    Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's expansion plans and implementation thereof, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

182.    In particular, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

183.    By virtue of their positions as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, plaintiffs have suffered damages in connection with their purchases of the Company's securities.

### COUNT III

### Violation of Section 18 of the Exchange Act

184.    Plaintiffs repeat and reallege the allegations of paragraphs "X" through "XX" above, as if fully set forth herein.

185.    Plaintiffs assert this claim against Defendants pursuant to Section 18 of the Exchange Act.

38

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

186.    Defendants made and/or caused to be made statements in publicly filed reports and documents, and such statements were at the time and in light of the circumstances under which they were made false and/or misleading with respect to the facts contained therein.

187.    Plaintiffs read and relied upon some or all of SB's Quarterly and Annual Financial Reports filed during the Relevant Purchase Period with the SEC ("SB's SEC Filings"), as well as the false and/or misleading statements contained therein, not knowing that they were false.

188.    Plaintiffs knew at the time that they read and relied upon SB's SEC Filings that they had been publicly filed.

189.    Plaintiffs purchased SB stock  based on the false and/or misleading statements alleged herein, including those statements contained in SB's SEC Filings.

190.    When the truth began to emerge about the false and misleading statements and omissions that were contained in SB's SEC Filings, Plaintiffs were significantly damaged by the resulting drop in value of SB's stock.

191.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with its purchase of SB's stock.

192.    By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act and are liable there under to Plaintiffs.

## COUNT IV

### Common Law Fraud, Misrepresentation and Deceit

193.    Plaintiff repeats and realleges the allegations of paragraphs "1" through "XX" above, as is fully set forth herein.

194.    Defendants made misrepresentations of fact and omissions of material fact to Plaintiff concerning SB's financial condition in connection with the Agreement.  These misrepresentations and omissions were material to Plaintiff's willingness to refrain from selling SB's stock.  If Plaintiff had known SB's true financial condition it would sold SB stock before the precipitous drop in value.

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

195. Defendants knew that their statements concerning SB's financial affairs were false when made, Defendants intended Plaintiff to rely on their statements, and Plaintiff's reliance on Defendants' statements was reasonable.

196. Defendants' conduct as alleged herein constitutes common law misrepresentation and fraud.

197. As a result of Defendants' misrepresentations, omission, fraud and deceit, Plaintiff is entitled to recover damages against Defendants, plus attorney's fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf, pray for judgment as follows:

A.   Awarding compensatory damages in favor of Plaintiffs against Defendants for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

B.   Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, and experts;

C.   Granting relief from the automatic stay under Section 362(d) of the United States Bankruptcy Code;

D.   Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiffs have an effective remedy; and

E.   Granting such other and further relief as the Court may deem just and proper.

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

1

## JURY TRIAL DEMANDED

2        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

3  by jury on all issues triable as of right by a jury.

4  Dated: September 12, 2008

    [

5                          **KELLER ROHRBACK, P.L.C.**

6

7                          By:_____

                                Gary Gotto

8                          3101 North Central Avenue

                          Suite 1400

9                          Phoenix, Arizona 85012

                          State Bar No.: 007401

10                       Tel:  602-248-0088

11                       Fax: 602-248-2822

12                       Mark C. Gardy

                          James S. Notis

13                       Charles Germershausen

                          **GARDY & NOTIS, LLP**

14                       440 Sylvan Avenue, Suite 110

                          Englewood Cliffs, New Jersey 07632

15                       Tel:  201-567-7377

                          Fax: 201-567-7337

16

17                       Lee Squitieri

                          **SQUITIERI & FEARON, LLP**

18                       32 East 57th Street

                          12th Floor

19                       New York, New York 10022

                          Tel:  212-421-6492

                          Fax: 212-421-6553

20

21                       *Counsel for Plaintiffs*

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS